Peter R. FITZPATRICK,
Petitioner-Appellee,

v.

Louie L. WAINWRIGHT,
Respondent-Appellant.

No. 85–5154.

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1986.

Rehearing and Rehearing En Banc
Denied Nov. 20, 1986.

Lee Rosenthal, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellant.

Margaret Good, Asst. Public Defender, West Palm Beach, Fla., for petitioner-appellee.

Before GODBOLD, and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

## CORRECTED OPINION

ANDERSON, Circuit Judge:

Fitzpatrick was convicted in state court on four counts of selling unregistered secu-

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sit-

ting by designation.

rities, four counts of fraud in connection with the sale of unregistered securities, and four counts of grand theft. These convictions were affirmed without opinion by the Florida Court of Appeals. Fitzpatrick filed a petition for a writ of habeas corpus in federal district court alleging that he was denied his right to assistance of counsel at trial and sentencing. Specifically, Fitzpatrick alleged that he was tried and sentenced pro se in the absence of a knowing and intelligent waiver, and that he was compelled to proceed without counsel in the absence of a determination that he could not afford an attorney. The United States Magistrate recommended denial of Fitzpatrick's petition concluding that Fitzpatrick knowingly and voluntarily chose to proceed pro se. The district court rejected the magistrate's conclusions of law and granted Fitzpatrick's petition for a writ of habeas corpus, noting that the state trial judge failed to hold an indigency hearing and failed to make sufficient inquiries as required by *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and its progeny. Because we conclude that Fitzpatrick made a knowing, intelligent and voluntary decision to represent himself, we reverse the district court's decision.

## FACTS

Since the issue of whether a criminal defendant knowingly and voluntarily waives his right to counsel depends on the circumstances of each case, a detailed recitation of the facts is warranted here. On June 19, 1981, a fourteen-count information was filed charging Fitzpatrick with sales of unregistered securities, sales of securities by misrepresentation, schemes to defraud or fraudulent business practices, and grand theft. Fitzpatrick, accompanied by private counsel, Joel Weissman, surrendered in open court on November 3, 1981. Weissman continued to represent Fitzpatrick through his release upon bond and initial discovery proceedings. On December 11, 1981, however, Weissman announced that he intended to withdraw from the case because he could not get along nor commu-

nicate with Fitzpatrick. On December 16, 1981, Weissman appeared upon his motion to withdraw and stated that Fitzpatrick refused to agree to pay his fee and would not remain in contact with him. Weissman also informed the court that he and the prosecutor, Oliver Harris, wanted to get Fitzpatrick a public defender because Weissman did not believe Fitzpatrick could afford private counsel.

On January 4, 1982, another private attorney, Leon St. John, appeared and stated that he had met with Fitzpatrick and requested a postponement of the case to settle whether he would represent the defendant. On January 6, 1982, St. John requested another continuance noting the complexity of this particular case. He indicated that he would discuss the complexity of the case with Fitzpatrick in negotiating his fee. St. John also stated that Fitzpatrick promised payment within a week, although Fitzpatrick told St. John that Fitzpatrick had no liquid assets. On January 22, 1982, the prosecutor appeared alone at the calendar call and reported that he had spoken with both Fitzpatrick and St. John the previous day. The prosecutor stated that Fitzpatrick was trying to obtain the money to retain St. John and needed a further one-week continuance, which was granted. On January 29, 1982, Fitzpatrick appeared in court and requested a two-week continuance, stating that he was still trying to raise the money to hire St. John. On February 12, 1982, Fitzpatrick reported that St. John wanted a substantial amount up front, but that he was still negotiating with St. John and needed two more weeks. He also stated that if he did not have an attorney after two weeks, he would defend himself. On February 26, 1982, Fitzpatrick told the court that he was "close" to hiring an attorney. The trial judge, while Fitzpatrick was present, suggested that the case would be a "disaster" if Fitzpatrick conducted his own defense. Harris, the prosecutor, mentioned the possibility of a public defender. Also, on February 26, the trial court set a firm trial date with a calendar call on May 28, 1982.

On April 1, 1982, the prosecution filed a motion to compel Fitzpatrick to retain an attorney or proceed pro se. The basis for this motion was that Fitzpatrick was using his attempts to hire an attorney as a delay tactic. This motion was filed by an assistant state attorney, Marta Suarez-Murias, who had not been present at any of the previous status check hearings.

On April 13, 1982, another private attorney, Marc Goldstein, filed a notice of appearance on Fitzpatrick's behalf stating that Fitzpatrick told him that family money would be freed up soon. On April 19, 1982, Goldstein requested more time explaining that the case required a large retainer and that he and Fitzpatrick were still negotiating the fee. On April 26, 1982, Goldstein told the court that Fitzpatrick was expecting a transfer of funds and more time was needed. Fitzpatrick told the court he was trying to raise money "off stocks."

On May 3, 1982, Fitzpatrick told the court that he was speaking with another attorney, Dowling, and that he would either retain an attorney or proceed pro se. Fitzpatrick also asked about the prosecutor's (Oliver Harris') suggestion that Fitzpatrick get a court-appointed lawyer. The new prosecutor, Ms. Suarez-Murias, responded that she had never suggested that Fitzpatrick receive appointed counsel. Ms. Suarez-Murias asked the court to enter an order requiring Fitzpatrick to retain counsel or proceed pro se. The court ordered Fitzpatrick to retain counsel by May 28, 1982, or represent himself, noting that trial of the case had been continued repeatedly so that Fitzpatrick could retain private counsel. The court also stated, however, that between May 3 and May 28 it would entertain a motion to consider Fitzpatrick's indigency for the purpose of deciding whether Fitzpatrick was entitled to appointed counsel.

On May 28, 1982, the court held another hearing on the issue of Fitzpatrick's representation. The trial judge asked Fitzpatrick, "Do you think you may be entitled to represent—are you indigent?" Fitzpatrick responded, "No, your honor, and I don't want a public defender at this point. I will comply with the order." Fitzpatrick requested more time to prepare. The court set the trial date for the week of July 12, 1982.

Toward the end of the May 28 hearing, the following exchange occurred:

The Court: Do you feel we need a signed waiver of counsel in this case?

Ms. Suarez-Murias: I think we should, Your Honor. I would hate to have—

The Court: Do you have a form?

You are entitled to be represented. Of course, if you cannot afford an attorney, we would appoint one for you; do you understand that?

Mr. Fitzpatrick: I understand.

The Court: There is no—

Ms. Suarez-Murias: Mr. Fitzpatrick is aware he has a right to claim indigency and raise that as an issue. You are not claiming indigency, and have no intention?

Mr. Fitzpatrick: No.

The Court: She's going to have something for you to sign.

Thank you.

Mr. Fitzpatrick: I am just signing that I agree that I am waiving right to counsel.

The waiver signed by Fitzpatrick in open court on May 28, 1982, includes, in part, the following advice:

If I am financially unable to obtain counsel, I have the RIGHT to Court-appointed counsel to represent me at First Appearance, Arraignment, and all subsequent proceedings....

Later, on July 12, 1982, at a motion to suppress hearing prior to trial, Fitzpatrick was again questioned at length about his desire for an attorney.

By Ms. Suarez-Murias:

Q Mr. Fitzpatrick, do you understand that the constitution of this country, of this state, provides that a defendant has the right to counsel in any and all criminal proceedings?

A Yes, I do.

Q You understand, also, sir, that in the event of an indigent defendant, as

defined by state law, the Courts have and continue to appoint counsel, whether it be the public defender or court appointed counsel to represent indigent defendants.

A Yes, I understand that indigent defendants can obtain counsel if they feel they need it.

I might add, up to this point, or until this matter here, Your Honor, I felt that I did not require counsel because it was not that complex and a theft and fraud case, Your Honor, you either took the money or you did not.

If you feel you got records to indicate where the money went, how it was spent, then I think that I've got no difficulty to represent to the jury or a judge up to this point.

Your Honor, okay, now, as far as there have been no complexities until what is involved in this motion this morning so, at this point in time, I would say that I am aware that you can have counsel and if you feel you need it.

Up until this point I have not felt that I needed it.

Q Mr. Fitzpatrick, so the record can be crystal clear, are you now saying that you need counsel?

A No, I am not saying I need counsel.

Q So, you fully understand your rights to have an attorney, and knowing that you waive that?

A Yes, at ten eighteen, July 12th, I waive that right.

Q All right, sir, are you then implying, and forgive me—

A I am not implying anything.

Q Being—

The Court: Let her finish.

By Ms. Suarez-Murias:

Q Mr. Fitzpatrick, just for the record, because the right to counsel is a very time-honored right, and we do not want any mistakes, are you saying, sir, that perhaps at ten twenty-two, you may change your mind?

You seem to keep saying up until this time, up until this time.

A I am not saying that.

The Court: It sounds like you are hedging.

Mr. Fitzpatrick: Hedging, Your Honor?

The Court: That's what it sounds like.

She's asking if five minutes from now are you going to say: Well, now I think I need counsel?

By Ms. Suarez-Murias:

Q We are about to embark on a five day trial.

A Then what I suggest is that she ask me—she should ask me that question after this motion is heard.

The Court: Okay

Mr. Fitzpatrick: Can I ask that?

The Court: He said let's—we will hear the motion.

Fitzpatrick was also questioned about his capacity to waive his right to counsel:

By Ms. Suarez-Murias:

Q Mr. Fitzpatrick, have you been the last few years in good physical health?

A Yes, I have.

Q And could you tell me whether you are now or have been in the recent past using any particular medication in any way that may impair your judgment?

A No.

Q Could you tell me, sir, whether any time in your lifetime a court of law has declared you mentally incompetent.

A No, no court of law has never.

Q Are you suffering any other physical or mental afflictions or diseases that may impair you in any way?

A No, I am not, not that I know of.

Q All right, sir, could you tell me, please sir, I mean, just briefly for the record, could you tell us your educational background?

A Yes. My educational background, I attended Jesuit High School, Jesuit College, in New York, New Jersey. I taught Latin, English and Humanities at St. Francis and I have taken courses in college.

Q Any other graduate school, at all?

A No. I was a Lieutenant in the Marine Corps in the Korean War and took several courses then.

Ms. Suarez-Murias: Your Honor, since we are going to have this again, after the motion, then I suggest that we conclude here and take it up again from there.

The Court: All right, fine, let's hear your motion.

At the conclusion of the suppression discussion, Fitzpatrick was again asked about waiving his right to counsel.

By Ms. Suarez-Murias:

Q Could you tell me please, sir, now that Judge Born has not made a ruling, could you tell me whether or not you still feel that you are willingly waiving your constitutional right to have an attorney represent you?

A Well, I would say at this point in time I am knowingly waiving that right because Judge Born has reserved his decision on the motion.

Q All right, sir, again—

A I am not hedging, Your Honor, that's the fact of the matter.

The Court: You are saying that you may find that you will find a lawyer when you get to that point; but, at that point it will be too late, just so you will know.

Mr. Fitzpatrick: Your Honor, I am sure that might be so. If, if complexities of this case surface, then I think I would admit that even if, even if you are not going to hear the motion then I could make it for my own reasons.

The Court: Sure.

Mr. Fitzpatrick: I am sure, maybe you understand it. I don't.

The Court: Well, he is saying maybe later he will ask. I assume that's what he is saying.

Ms. Suarez-Murias: Only thing, I don't want to belabor this, but if it weren't for the history of this case I wouldn't be quite as worried as I am now, but I want Mr. Fitzpatrick to understand and to so

state that once we start on this ship it's not going to dock until that—

The Court: I think he understands that. But he's saying that does the defendant have a right to make a motion later.

And, he certainly has that right to make that motion.

On July 12, 1982, Fitzpatrick's trial commenced. In his opening statement at trial, Fitzpatrick told the jury:

And, that's one of the reasons I am defending myself. If I felt that, in any way, I, what I did here that I was incapable of proving where all the money went, that I, myself and my family were a substantial investor in the beginning, and after two months later down the road, then I think I would make sure that I had an experienced attorney.

Fitzpatrick also stated, however, that

As far as the unregulated sale of securities, that is a high, high technical area. How does one sell a security, what constitutes a security?

During the trial, Fitzpatrick stated that he believed he could have declared himself indigent up to "last Thursday," but did not do so because he always thought he would retain private counsel. Fitzpatrick was convicted on twelve counts of the information.[1]

The court sentenced Fitzpatrick to concurrent terms of five years incarceration on four counts, to be followed by concurrent terms of five years probation on eight counts. The trial judge concluded the sentencing hearing by telling Fitzpatrick that he was entitled to appointed counsel for appeal if he could not afford counsel. Fitzpatrick had previously informed the court that Robert Hackney would represent him on direct appeal. Fitzpatrick responded to the judge's statement about appointed counsel by stating that he had "already taken care of that."

On October 7, 1982, Hackney moved to withdraw. His motion was granted. The court told Fitzpatrick that if he were un-

---

1. Two counts had been previously dismissed.

able to make financial arrangements for counsel and so informed the court, a hearing would be held to determine whether he was indigent. Fitzpatrick replied: "I understand that, your honor. I wish you would have done that before." The judge responded by reminding Fitzpatrick of their many previous conversations concerning his eligibility for appointed counsel.

On November 17, 1982, a hearing was held to determine Fitzpatrick's right to appointment of appellate counsel. Fitzpatrick was determined to be indigent for appellate purposes only. A public defender has continued to represent Fitzpatrick throughout all subsequent proceedings in this case, including this federal habeas corpus proceeding.

## DISCUSSION

I. State Court Finding: Fitzpatrick Understood Indigency

■ In order to satisfy the Sixth Amendment, a defendant's waiver of his right to counsel must be an intentional relinquishment of a known right or privilege. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1983); *Hance v. Zant*, 696 F.2d 940, 947 (11th Cir.1983). Fitzpatrick argues on appeal that because he did not understand the legal significance of the term "indigency," he did not know that he might have been entitled to court-appointed counsel. Therefore, he claims, since he was not aware of his potential right to appointed counsel, he could not have intelligently waived that right. The district court found that Fitzpatrick was told he must be "indigent" to be entitled to a court-appointed lawyer, but that the meaning of "indigency" was not explained to Fitzpatrick until a post-trial hearing on October 7, 1982. The district court concluded, therefore, that Fitzpatrick did not understand the legal meaning of that term when he waived his right to counsel at trial. Record on Appeal at 212.

■ Although the question of whether a waiver of the Sixth Amendment right to counsel is a mixed question of law and fact, *Brewer v. Williams*, 430 U.S. 387, 404, 97

S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), the question of whether Fitzpatrick understood the meaning of the term "indigency" is purely factual. On October 7, 1982, at a hearing on Fitzpatrick's motion for a new trial and Fitzpatrick's attorney's motion to withdraw, the following exchange between the trial judge and Fitzpatrick took place:

THE COURT: Now, if you are going to come right up—let me know if you think you are entitled to representation at the cost of the State. I want you to come back in here, make a—if you file a letter saying that, we will bring you back over here. If you are unable to make some arrangement with Mr. Hackney, I will hear you again on that, on the question of whether or not you are indigent at that point where you cannot afford to hire a lawyer. I will hear you again on the appeal side of it.

THE DEFENDANT: I understand that, Your Honor.

I wish you would have done that before.

THE COURT: Well, don't say that. We talked about it. Every time you said: Oh, no, I am not indigent; I can hire a lawyer.

Trial Record at 746. We conclude that the trial judge's statement is an implicit finding of fact that Fitzpatrick indeed understood the meaning of the term "indigency." This implicit finding is entitled to a presumption of correctness in a proceeding under 28 U.S.C. § 2254. *See Paxton v. Jarvis*, 735 F.2d 1306, 1309 (11th Cir.1984); *see also Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). The district court erred in not presuming this state finding of fact to be correct.

■ The record contains ample evidence supporting the state court's implicit finding that Fitzpatrick understood the meaning of the term "indigency." The waiver of counsel form that Fitzpatrick signed on May 28, 1982, stated, in part, "If I am financially unable to obtain counsel, I have the RIGHT to Court-appointed counsel...." Record on Appeal at 41. More-

over, immediately prior to Fitzpatrick's signing the form, the trial judge specifically advised Fitzpatrick: "Of course, if you cannot afford an attorney, we would appoint one for you; do you understand that?" Fitzpatrick responded, "I understand." Trial Record at 45–46. The record demonstrates that Fitzpatrick was clearly advised that an attorney would be appointed for him if he could not afford one. This record evidence amply supports the state court's finding that Fitzpatrick did understand the term "indigency."[2] Consequently, Fitzpatrick was able to knowingly and intelligently waive his right to counsel and decide to proceed pro se.

## II. The *Faretta* Standard

### A. *Clear and Unequivocal Assertion of the Right of Self-Representation*

Having concluded that the district court erroneously failed to defer to the state court finding that Fitzpatrick understood the meaning of the term "indigency," we next address whether or not Fitzpatrick has asserted his right of self-representation, and whether or not he understood the risks of self-representation in such manner that the *Faretta* standard is met.

■ In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court held that an accused has a Sixth Amendment right to conduct his own defense. Although both the right to counsel and the right to self-representation arise out of the Sixth Amendment, these rights are not precise opposites. *United States v. Tompkins*, 623 F.2d 824, 827 (2d Cir.1980). While a defendant's exercise of the right to self-representation necessarily involves the waiver of the right to be represented by a

trained attorney, *Hance v. Zant*, 696 F.2d 940, 949 (11th Cir.1983), trial courts must apply additional safeguards before allowing a defendant to proceed pro se.

■ Before a court permits a defendant to represent himself at the trial, the defendant must clearly and unequivocally assert the right of self-representation. *Raulerson v. Wainwright*, 732 F.2d 803, 808 (11th Cir.), *cert. denied*, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984). *See Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. The record clearly indicates that Fitzpatrick made such an assertion. On May 28, 1982, Fitzpatrick not only stated that he did not want a public defender, Trial Record at 39, but he signed a written waiver expressly waiving his right to be represented by counsel. Record on Appeal at 41. Fitzpatrick's statements on July 12, immediately prior to trial, further show that Fitzpatrick clearly and unequivocally asserted his right to represent himself at trial. The prosecutor and trial judge took great pains to have Fitzpatrick clarify whether he affirmatively wanted to proceed without the assistance of counsel.

At that pretrial hearing, the following exchange between Fitzpatrick and the prosecutor occurred:

Q Mr. Fitzpatrick, so the record can be crystal clear, are you now saying that you need counsel?

A No, I am not saying I need counsel.

Q So, you fully understand your rights to have an attorney, and knowing that you waive that?

A Yes, at ten eighteen, July 12th, I waive that right.

---

**2.** Although Fitzpatrick was declared indigent for appellate purposes, no such determination was made with respect to Fitzpatrick's right to appointed counsel at trial. Because we find that Fitzpatrick knowingly, intelligently and voluntarily waived his right to counsel at trial and sentencing, we need not decide whether Fitzpatrick was actually entitled to a public defender at trial.

Fitzpatrick also argues that the trial judge erred by failing to hold an indigency hearing to determine whether Fitzpatrick had a right to court-appointed counsel. In light of our finding that Fitzpatrick understood that he had a right to court-appointed counsel if he could not afford one, and in light of our conclusion that Fitzpatrick validly waived his Sixth Amendment right to counsel, although we expressly do not decide whether the trial judge was required to hold such a hearing, any error on the part of the trial judge by this omission was harmless.

Trial Record at 52. *See also* Trial Record at 50–55, 84–86. We conclude that Fitzpatrick did clearly and unequivocally assert the right to self-representation.

B. *Understanding the Disadvantages of Self-Representation*

 *Faretta* and its progeny suggest that, in addition to the presence of a clear and unequivocal assertion of the right of self-representation, other safeguards are required. Because a defendant who exercises the right to conduct his own defense relinquishes many of the important benefits associated with the right to an attorney, a trial judge should normally conduct a waiver hearing to insure that the defendant understands the disadvantages of self-representation, including, *inter alia,* the defendant's understanding of the risks and complexities of his particular case. *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *Raulerson v. Wainwright,* 732 F.2d 803, 808 (11th Cir.1984); *Hance v. Zant,* 696 F.2d 940, 949 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), *overruled on other grounds, Brooks v. Kemp,* 762 F.2d 1383 (11th Cir. 1985); *United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir.1981) (Unit B).[3] In the instant case, there were several hearings. Fitzpatrick was questioned with respect to his desire to proceed pro se at a calendar call on May 28, 1982 (at which time he signed a written waiver of his right to counsel), and, on July 12, 1982, the day of the trial. Trial Record at 37–94. However, the thrust of these examinations was whether Fitzpatrick wanted an appointed attorney, rather than the disadvantages of Fitzpatrick's self-representation.[4] The recorded colloquies between the judge, the prosecutor and Fitzpatrick in this case did not expressly address Fitzpatrick's under-

standing of the risks of self-representation. However, the case law indicates that, while a waiver hearing expressly addressing the disadvantages of a pro se defense is much to be preferred, it is not absolutely necessary. The ultimate test is not the trial court's express advice, but rather the defendant's understanding. *See United States v. Hafen,* 726 F.2d 21, 26 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *United States v. Kimmel,* 672 F.2d 720, 721–22 (9th Cir. 1982). *But see United States v. Welty,* 674 F.2d 185, 188 (3d Cir.1982). If the trial record demonstrates that Fitzpatrick's decision to represent himself was made with an understanding of the risks of self-representation, the knowing, intelligent, and voluntary waiver standard of the Sixth Amendment will be satisfied. So long as the record establishes that Fitzpatrick " '[knew] what he [was] doing and his choice [was] made with eyes open,' " the trial judge's decision to allow Fitzpatrick to represent himself will be upheld. *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241–42, 87 L.Ed. 268 (1942)).

 Although the Supreme Court has not precisely defined the extent of the *Faretta* inquiry, lower courts have examined a variety of factors in analyzing this issue. As previously stated, a valid waiver must be made knowingly and intelligently. This question depends on the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). "Background factors" that have been considered include the defendant's age and educational background. *Mixon v. United States,* 608 F.2d 588, 590

---

**3.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34. *Cf. Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

**4.** Apparently, the only time the trial judge expressly indicated to Fitzpatrick the dangers of proceeding pro se was on February 26, 1982, when the judge said in Fitzpatrick's presence, "I sure don't want to try it with him representing himself. That would be a disaster." Trial Record at 27.

(5th Cir.1979), *vacated on other grounds,* 616 F.2d 253 (5th Cir.1980).[5] *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541. In Fitzpatrick's case, these factors militate in favor of finding a valid waiver. Fitzpatrick was not a minor nor uneducated. Fitzpatrick's own testimony established that he attended high school, took college courses and taught Latin, English, and humanities in high school. Although the record does not reflect his precise age, Fitzpatrick stated that he was a lieutenant in the Marine Corps in the Korean War. Trial Record at 55. Fitzpatrick also stated that he was in good physical health, he was not using any medication that might impair his judgment, he was not suffering from any physical or mental affliction or disease that might impair his judgment, and he had never been declared mentally incompetent by a court of law. Trial Record at 54–55. Especially relevant to Fitzpatrick's understanding of the risks of self-representation with respect to the securities charges is the fact that he is an experienced stockbroker. Trial Record at 185.

Another factor courts consider in determining whether the risks of a pro se defense are understood is whether a defendant is represented by counsel before trial. *United States v. Hafen,* 726 F.2d 21, 25 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984). Although it would not be fair to characterize Fitzpatrick's relationship with the attorneys he attempted to hire as "representation," it is apparent from the record that Fitzpatrick had significant contact with those attorneys. Through this contact, he must have recognized that his case was more complex than he originally thought. For example, on January 6, 1982, Leon St. John, appearing on behalf of Fitzpatrick, stated that he would discuss the complexity of the case with Fitzpatrick in negotiating his fee. Supp.Record, vol. 2 at 2–3. On

April 19, 1982, Marc Goldstein stated that he and Fitzpatrick were negotiating a fee which, "because of the nature of the case, [required] a fairly large sum of money as a retainer." Trial Record at 32. Fitzpatrick's contact with St. John, Goldstein and other attorneys inevitably gave Fitzpatrick some indication of the difficulty of self-representation in his particular case.

Other factors courts consider in determining whether a defendant's decision to represent himself is knowing and intelligent also tip the scales in favor of finding a valid waiver in this case. One of these factors is Fitzpatrick's knowledge of the nature of the charges and the possible penalty he was subject to if convicted. *Maynard v. Meacham,* 545 F.2d 273, 279 (1st Cir.1976). During the July 12 hearing prior to the beginning of trial, the trial judge and prosecutor, in Fitzpatrick's presence, discussed the gravity of the charges, specifically that all crimes charged against Fitzpatrick were third-degree felonies. Trial Record at 86. Further, the transcript of that hearing clearly shows that Fitzpatrick understood the nature of the charges against him prior to trial. *See* Trial Record at 65–95.[6]

Another factor to be considered in this case is whether Fitzpatrick understood that he would be required to comply with the rules of procedure at trial. *Maynard v. Meacham,* 545 F.2d at 279; *see Faretta,* 422 U.S. at 808 n. 2, 835–36, 95 S.Ct. at 2527 n. 2, 2541–42. Fitzpatrick's experience representing himself at the pre-trial motion to suppress hearing made him sufficiently aware that he was required to comply with court rules. At the July 12 hearing immediately preceding Fitzpatrick's trial on that same day, the trial judge heard Fitzpatrick's motion to suppress certain evidence. Trial Record at 47–94. Our review of the transcript of this hearing reveals

---

5. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

6. Although it is clear that Fitzpatrick understood the nature of the charges against him and that the charges were serious felony charges, the face of the record does not show that he knew the possible penalties he might receive if convicted.

that Fitzpatrick understood about compliance with normal court procedure, and that he generally knew how to handle himself in court. Trial Record at 55–83. Moreover, Fitzpatrick's own comments indicate that he felt that the procedural aspects of his case were manageable. *See* Trial Record at 52 ("[A]s far as there have been no complexities ... involved in this motion ... I have not felt that I needed [counsel]."); *see also* Trial Record at 85.

Other factors considered by courts in determining the validity of a *Faretta* waiver include whether the waiver was a result of coercion or mistreatment of the defendant, *Blassingame v. Estelle*, 604 F.2d 893 (5th Cir.1979), whether the exchange between the defendant and the court consisted merely of pro forma answers to pro forma questions, *United States v. Gillings*, 568 F.2d 1307, 1309 (9th Cir.), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 760 (1978); *United States v. Curcio*, 680 F.2d 881, 889 (2d Cir.1982), and whether the defendant had knowledge of possible defenses he might raise, *Maynard v. Meachum*, 545 F.2d 273 (1st Cir.1976); *United States v. Welty*, 674 F.2d 185, 189 (3d Cir. 1982). There is no evidence in this case that Fitzpatrick's decision to proceed pro se was the result of coercion or mistreatment. Neither were the colloquies between Fitzpatrick and the prosecutor of the type criticized in *Gillings* and *Curcio*. On the contrary, while some of the questions posed to Fitzpatrick were "yes" or "no," for the most part Fitzpatrick's responses were in narrative form.

Further, it is clear that Fitzpatrick had knowledge of some legal challenges he might raise in defense of the charges against him. On the day of trial, Fitzpatrick moved and argued forcefully for the suppression of evidence that the prosecution planned to present. In defense of the fraud charges, Fitzpatrick indicated prior to trial that he planned to trace the funds he had allegedly misappropriated so that the jury would be satisfied that he had done nothing wrong. Although we realize that Fitzpatrick's technical legal knowledge did not approach that of a skilled attorney, his legal acumen need not rise to that level to satisfy *Faretta*. Rather, Fitzpatrick need only to have appreciated the risks of self-representation and his knowledge of possible defenses tends to show that he understood at least some of the complexities of his case.

Another factor that is important in this case is whether the defendant was attempting to delay or manipulate the proceedings. *United States v. Tompkins*, 623 F.2d 824, 828 (2d Cir.1980); *see United States v. Fowler*, 605 F.2d 181, 183 (5th Cir.1979). Evidence of manipulation or intentional delay implies a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial. As can be readily seen from our recitation of the facts, Fitzpatrick manipulated the proceedings, the trial court and his numerous attorneys in an attempt to delay as long as possible having to answer the charges against him. *See supra* pp. 1059–1063.

Two other factors courts have considered weigh in favor of finding that Fitzpatrick's understanding of the disadvantages of self-representation was inadequate. Fitzpatrick had had no previous involvement in criminal trials, *see Hafen*, 726 F.2d at 25, nor was stand-by counsel appointed to assist him with his pro se defense, *see Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46; *Hance v. Zant*, 696 F.2d 940, 950 n. 6 (11th Cir.), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), *overruled on other grounds, Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985); *Hafen*, 726 F.2d at 25. Despite these two factors favorable to Fitzpatrick, we nonetheless conclude that, in light of the other factors previously discussed, Fitzpatrick sufficiently understood the disadvantages of conducting a pro se defense to satisfy the *Faretta* standard.[7]

---

7. At the sentencing hearing of September 29, 1982, Fitzpatrick was asked whether he waived his right to counsel for sentencing. Fitzpatrick replied, "specifically, for the purpose of sentenc-

Although we recognize that only rarely will the *Faretta* standards be satisfied absent a hearing at which the defendant is expressly advised of the risks and disadvantages of self-representation, we conclude that this is such a case. Fitzpatrick's background and sophistication in the securities area combined with his contact with numerous attorneys prior to trial convince us that Fitzpatrick specifically understood, as he said in his opening statement at trial, that securities fraud is a "high[ly] technical area." This understanding, in addition to his knowledge of at least some available defenses, his obvious attempts to manipulate the proceedings, and the other factors discussed above persuade us that he sufficiently understood the risks of a pro se defense such that the *Faretta* requirements are met.

## CONCLUSION

Although the district court's decision acknowledged that *Faretta v. California* controls the determination of whether Fitzpatrick was properly permitted to represent himself, it did not follow the analysis outlined above nor did it reach the correct conclusion. The district court's analysis was thrown off track initially by the erroneous finding that Fitzpatrick did not understand that he was entitled to an appointed attorney if he was financially unable to hire one. We have held that deference is properly due to the state court finding that Fitzpatrick understood the meaning of the term "indigency," and that, because that finding was correct, Fitzpatrick was able to make a knowing and intelligent decision to represent himself. We have also concluded that Fitzpatrick clearly and unequivocally asserted his right to self-representation and that he sufficiently understood the disadvantages of his pro se defense to satisfy *Faretta*, despite the trial court's failure to expressly advise him of those disadvantages.

For the foregoing reasons, the decision of the district court is

REVERSED.

ATKINS, Senior District Judge, dissenting:

Defendant, a state prisoner, filed a writ of habeas corpus, and the district court entered a judgment granting his petition.[1] The basic issue presented on appeal is whether the defendant made a voluntary and intelligent waiver of his right to counsel.[2] Specifically, appellee contends that he did not knowingly and intelligently waive

---

ing, I guess so." The trial court asked Fitzpatrick if he realized he was entitled to have an attorney appointed if he could not afford one. Fitzpatrick responded that he understood, but further stated:

> I cannot say, your honor, that I cannot afford one.... I cannot stand up and say I am indigent.... Well, I have had the opportunity to procure private counsel which I haven't been able to do because of the liquidity problem. By the same token, I assumed that I could not ask you for, the state to pay for counsel just because I was liquid. I don't know, I don't know. Is liquidity a ground, your honor, then I would like an attorney.

Arguably, this statement is a revocation of the "clear and unequivocal" assertion of his right to self-representation that Fitzpatrick made before trial. Although Fitzpatrick's appellate brief is couched in terms of improperly permitting him to proceed pro se at trial and sentencing, Fitzpatrick has not argued at any stage of this federal habeas corpus proceeding that his statement at the sentencing hearing constituted a revocation of his *Faretta* assertion and that he, therefore, was entitled to an attorney at sentencing even if he was properly permitted to proceed pro se at trial. Nor has Fitzpatrick argued before the magistrate, the district judge or this court that he seeks a new sentencing hearing even if a new trial is not in order. Since Fitzpatrick has not pressed the issue in federal court, we need not decide whether Fitzpatrick's statement at sentencing operated as a revocation of his previous clear and unequivocal assertion of the right to self-representation.

1. Defendant was found guilty of four counts of selling unregistered securities, four counts of fraud, and four counts of grand theft on September 29, 1982.

2. "In determining whether there is a competent, informed and intelligent waiver, the judge before whom an accused appears without counsel is charged with a serious responsibility that cannot be perfunctorily performed. All reasonable presumptions must be indulged against a waiver." *McConnell v. United States*, 375 F.2d 905, 910 (5th Cir.1967) (citations omitted).

his right of counsel for two reasons. First, he urges that the court should have conducted an indigency inquiry to establish his right to a court appointed counsel. Second, he argues that the court failed to warn him of the dangers and disadvantages of self-representation as required by *Faretta* and its progeny. After carefully reviewing the circumstances of this case, I would affirm the district court.

## I. The Right to Counsel

I pause to review briefly the major cases which have discussed the right to counsel in criminal proceedings. By reviewing these cases, one can better understand the critical role that defense counsel provides, and the special safeguards that the court requires to ensure that this fundamental right is not waived lightly.

The right to counsel is firmly established. The Sixth Amendment specifically provides that a criminal defendant shall enjoy the right to have the assistance of counsel for his defense. Several significant cases have clarified the scope of this right.

In *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the Court emphasized the importance of counsel by holding that, absent a valid waiver, the assistance of counsel was a jurisdictional prerequisite to a federal court's authority to deprive an accused of life or liberty. Later, in *Gideon v. Wainright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Court held that the right to have the assistance of counsel in all criminal prosecutions was made obligatory upon the states through the Fourteenth Amendment. The court determined that the assistance of counsel is a fundamental right and essential for fair trials.[3] Many other cases have further clarified the scope of the right to counsel, but their common message is

clear—before an individual may be deprived of life or liberty, he must be afforded a meaningful opportunity to have the assistance of counsel in preparing his defense. *See Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Scott v. Illinois,* 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979).

## II. The Failure to Conduct an Indigency Inquiry

The indigency issue is troublesome. On the one hand, it seems clear that defendant was indigent. Yet, he expressly stated that he did not want a public defender, and he waived his right to a court-appointed counsel. Therefore, if the *Faretta* safeguards had been satisfied, this issue would be insignificant. Under the circumstances of this case, however, I believe that an indigency inquiry should have been conducted, because the indigency question is intricately interrelated with the *Faretta* issue.

### A. The Importance of the Indigency Determination

In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court held that a criminal defendant had a right to self-representation; however, the Court discussed special measures which would protect an accused. For example, the Court hinted that a trial judge could prevent many problems by appointing a qualified lawyer to act as a "standby counsel." *Id.* at 834–35 n. 46, 95 S.Ct. at 2541 n. 46 ("Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help."). Justice Burger further emphasized this protective measure in his dissent. *Id.* at 846 n. 7, 95

---

**3.** Perhaps Justice Black best articulated the basis for legal assistance to all criminal defendants when he wrote these words:

> The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries but it is in ours. From the very beginning, our state

and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. *Id.* at 344, 83 S.Ct. at 796.

S.Ct. at 2529 n. 7.[4] The importance of the standby counsel is further enhanced when one recognizes that a defendant may waive his right to self-representation if he later decides to act as co-counsel, *Raulerson v. Wainwright,* 732 F.2d 803, 809 (11th Cir. 1984), or if he abandons his initial request, *Brown v. Wainwright,* 665 F.2d 607, 611 (5th Cir.1982) (*en banc*).

Because the court failed to determine that defendant was indigent, no standby counsel was appointed. Thus, defendant had no opportunity to request the assistance of counsel during the trial. In effect, the trial court prevented any subsequent waiver of defendant's right to self-representation.

In this case, the absence of a standby counsel was significant. On the second day of trial, as the complexity of the case became apparent, defendant said, "I have to get a lawyer." Later, defendant requested additional time to prepare his closing argument. He said, "I found out it's very complex." Under these circumstances, it is apparent that defendant wanted the assistance of counsel once the trial began.

### B. Facts Demonstrating that Defendant was Indigent

The majority concludes that the trial judge made an implicit finding of fact that defendant understood the meaning of the term "indigency" and that this conclusion was not clearly erroneous. I cannot agree. The record conclusively establishes that defendant misunderstood the term.

The most poignant fact, of course, is that when a hearing was finally held, defendant was found to be indigent. Moreover, the state does not dispute the fact that defendant was indigent and unable to afford counsel at the time of trial. Additionally, several attorneys informed the court that defendant was indigent.[5] Finally, defendant expressly indicated that he had a liquidity problem. Prior to trial, he stated that he was trying to raise the necessary funds by selling stock. Later, during his sentencing hearing, he said, "Is liquidity a ground, your honor, then I would like an attorney." [6]

### III. The *Faretta* Issue

Through *Zerbst, Gideon,* and other cases, the Court established that a criminal defendant must be provided with an opportunity to have the assistance of counsel before he could be deprived of life or liberty. As the years passed, however, the right to counsel evolved from a privilege to a requirement in many courts. It was in this context that Mr. Anthony Faretta found himself forced to accept legal assistance, although he insisted that he wanted to conduct his own defense.[7]

Ultimately, the Court held that a criminal defendant had a constitutional right to conduct his own defense. *Faretta,* 422 U.S. at 836, 95 S.Ct. at 2541–42. Yet, the Court reached this conclusion reluctantly and with a certain degree of trepidation.

For example, the court stated, "There can be no blinking the fact that the right of an accused to conduct his own defense

---

4. The appointment of standby counsel is a well recognized safeguard, and one that is being employed by trial judges within this circuit. See *United States v. Edwards,* 716 F.2d 822, 824 (11th Cir.1983) (*per curiam*). *See also Hance v. Zant,* 696 F.2d 940, 950 n. 6 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), overruled on other grounds in *Brooks v. Kemp,* 762 F.2d 1383 (11th Cir.1985) (*en banc*).

5. Mr. Weissman withdrew as defense counsel because defendant could not pay his fee. Then, Weissman along with the prosecutor, Mr. Harris, told the judge that defendant needed a public defender, because defendant could not afford

private counsel. Later, Mr. St. John informed the court that defendant lacked sufficient assets to pay his retainer. Finally, Mr. Goldstein indicated that defendant was relying upon "family money" to pay his fee.

6. At the sentencing hearing, defendant clearly "vacillated" on the issue of self-representation and effectively waived the right. *See Brown,* 665 F.2d at 611.

7. The trial court's concerns were well founded. When the judge quizzed Mr. Faretta on basic legal principles, defendant demonstrated his inability to represent himself. *See Faretta,* 422 U.S. at 808 n. 3, 95 S.Ct. at 2528 n. 3.

seems to cut against the grain of this Court's decision holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure the defendant a fair trial. *Id.* at 832–33, 95 S.Ct. at 2539–40 (citations and footnotes omitted).

The Court's solution was to emphasize an individual's freedom of choice. In other words, the Constitution requires that a defendant have an opportunity to have legal representation, but that right may be waived by a defendant who knowingly and intelligently chooses to represent himself after being made aware of the dangers and disadvantages of self-representation. *Id.* at 833–36, 95 S.Ct. at 2540–42.

Subsequent cases have examined the relationship between the right to assistance of counsel and the right of self-representation. Overwhelmingly, the courts have concluded that the right to counsel is preeminent over the right to self-representation.[8] *Brown,* 665 F.2d at 610. Therefore, the law requires the special protections of a clear and unequivocal assertion of the right to self-representation and that a defendant understand the risks and disadvantages of self-representation. *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541.

### A. The Clear and Unequivocal Assertion of the Right of Self-Representation

The case law clearly indicates that assistance of counsel is strongly preferred over self-representation. If defendant is silent on the subject, counsel should be provided. If defendant vacillates on the issue, counsel should be provided. If defendant abandons his request, counsel should be provided.

With this point in mind, the facts demonstrate that defendant failed to waive his right to counsel.

In this case, defendant made numerous attempts to hire private counsel. He only reluctantly decided to represent himself when his attempts to hire a lawyer proved fruitless. The trial judge ordered defendant to obtain private counsel or proceed *pro se* unless he moved for an indigency inquiry prior to May 28. Since he made no motion prior to this deadline, and was unable to hire a private attorney, he had no choice but to represent himself. Under these circumstances, his decision seems a far cry from an affirmative, clear and unequivocal assertion of the right to self-representation. Instead, the record demonstrates that defendant earnestly desired the assistance of counsel, but was unable to afford one.

### B. Understanding the Dangers and Disadvantages of Self-Representation

The majority states that a waiver hearing regarding the disadvantages of a *pro se* defense is recommended but not absolutely essential, provided that the defendant actually understood those dangers and disadvantages.[9] Yet, the Eleventh Circuit has consistently indicated that this hearing is mandatory. *Raulerson,* 732 F.2d at 808; *United States v. Edwards,* 716 F.2d 822, 824 (11th Cir.1983); *Hance,* 696 F.2d at 949; *United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir.1981) (Unit B). I see no reason to abandon our well established procedure.[10]

The mandatory nature of the *Faretta* inquiry is justified because the Court has recognized that a defendant's decision to go *pro se* is tantamount to pleading guilty—the process is just a little slower

---

**8.** "If on arraignment an indigent defendant stands mute, neither requesting counsel nor asserting the right of self-representation, an attorney must be appointed." *Brown,* 665 F.2d at 611.

**9.** The facts demonstrate that defendant did not actually understand the problems of self-representation.

**10.** A defendant may waive his right of self-representation by walking out of the *Faretta* hearing. *Raulerson,* 732 F.2d at 809.

and perhaps move painful.[11] For example, Justice Sutherland once wrote:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed.2d 158 (1932). Similarly, the majority in *Faretta* recognized that a *pro se* defendant "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. Furthermore, the dissenting justices emphasized this point. Chief Justice Burger asked, "The fact of the matter is that in all but an extraordinarily small number of cases an accused will lose whatever defense he may have if he undertakes to conduct the trial himself." *Id.* at 838, 95 S.Ct. at 2543. Justice Blackmun said, "The court concludes that self-representation must be allowed despite the obvious dangers of unjust convictions in order to protect the individual's right of free choice. As I have already indicated, I cannot agree to such a drastic curtailment of the interest of the State in seeing that justice is done in a real objective sense." *Id.* at 851, 95 S.Ct. at 2549. In short, the *Faretta* inquiry functions much like the guilty plea procedure—both protect a defendant by educating him and ensuring that his decision is "voluntary and intelligent."

### IV. Conclusion [12]

Defense counsel provides an important role in ensuring that criminal trials lead to just results. In this case, the judge knew three crucial facts. First, he knew defendant wanted the assistance of a private attorney. Second, he was informed by several attorneys, including one prosecutor, that defendant could not afford counsel. Third, he knew that it would be a disaster for defendant to proceed *pro se.* Nevertheless, he failed to hold an indigency hearing and he failed to hold a *Faretta* waiver

---

**11.** When a defendant pleads guilty, the court must critically evaluate the plea. First, the court discusses various items with the defendant to guarantee that he has a meaningful understanding of his decision. Second, the court determines whether there is a factual basis for the plea. Finally, the court ensures that the decision to plead guilty is voluntary. *See Fed.R. Crim.P.* 11.

**12.** In *Faretta,* one of the dissenting Justice's concerns was that the case would invite increased appellate litigation. The majority's holding, "that only rarely will the *Faretta* standards be satisfied absent a waiver hearing" suggests that a case-by-case review will be necessary in the future. Thus, increased litigation is invited once again. I would prefer to articulate the content of the *Faretta* colloquy so trial judges would be better guided in the future. For example, the court should inform a defendant that motions may be presented before, during, and after trial. Then the judge should ask the defendant to name one example of a pretrial motion, etc. Next, the court should warn a defendant that he will be required to adhere to the court's rules of evidence and procedure, and quiz the defendant briefly on a couple of rules, as the trial judge in *Faretta* did. *See id.* at 808 n. 3, 95 S.Ct. at 2528 n. 3. Then, the court should inquire as to whether the defendant is familiar with each element of the offense charged. Further, the court should inquire as to whether a defendant is aware of any possible defense for each offense. Finally, the court should suggest that counsel could assist the defendant in all areas of defense.

The Court's use of this colloquy would achieve three goals. First, the defendant would be appraised of the dangers and disadvantages of proceeding *pro se.* Second, defendant could still choose between the assistance of counsel and self-representation. Finally, its use would decrease appellate litigation because trial judges would be insulated from error when this colloquy was performed.

 

hearing. Under these circumstances, the trial court erred.