UNITED STATES of America, Appellee,

v.

**Darrell G. HAFEN, Defendant, Appellant.**

No. 83–1156.

United States Court of Appeals, First Circuit.

Argued Dec. 8, 1983.

Decided Feb. 1, 1984.

Certiorari Denied April 30, 1984.

See 104 S.Ct. 2179.

---

Owen S. Walker, Boston, Mass., for defendant, appellant.

Brackett B. Denniston, III, Asst. U.S. Atty., Boston, Mass., with whom William F.

Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

COFFIN, Circuit Judge.

Appellant Darrell Hafen was convicted of nineteen counts of mail fraud after a six-day jury trial in the United States District Court for the District of Massachusetts. Hafen raises two issues on this appeal. First, he argues that blacks were "systematically and substantially underrepresented" on the master wheel from which grand and petit jurors were selected, and that for this reason the court should have granted his motion to dismiss the grand jury's indictment. Second, he contends that his waiver of the counsel appointed to represent him at trial was not knowing and intelligent. We disagree with both propositions and affirm the conviction.

Juries in the Eastern Division of the District of Massachusetts are selected according to the District Court Selection Plan, which provides that a master pool be randomly selected from voter registration lists. Persons whose names are selected receive qualification questionnaires to determine whether they should be exempt from jury duty. The names of those who are not exempt are entered on the master jury wheel; both grand and petit jurors are selected randomly from this wheel. Appellant argues that because a smaller percentage of blacks than of whites registers to vote in the Eastern Division of Massachusetts, the use of voter registration lists alone, without supplementation from other sources, results in an underrepresentation of blacks on the master jury wheel.

█ It is well established that a defendant is entitled to a jury drawn from a fair cross section of the community,[1] and that he

---

* Of the United States Court of International Trade, sitting by designation.

1. The Sixth Amendment guarantees every accused a reasonably representative jury, *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975), and the Jury Selection and Service Act, 28 U.S.C. § 1861, guaran-

tees "juries selected at random from a fair cross section of the community". The constitutional and the statutory requirement have been construed as functional equivalents. *United States v. Test*, 550 F.2d 577, 584–85 (10th Cir.1976).

has standing to assert a violation of the fair-cross-section requirement regardless of his race. *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court established a three-part test for jury composition challenges:

> "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364, 99 S.Ct. at 668.

█ Appellant meets the first part of the *Duren* test without difficulty: the Supreme Court has held that blacks are a "distinctive group" for the purposes of jury composition challenges. *See Peters v. Kiff,* 407 U.S. at 498–99, 92 S.Ct. at 2166, and cases there cited. In order to demonstrate to the trial court that the representation of blacks on the Eastern Division master jury wheel was not "fair and reasonable", appellant submitted an affidavit showing that of the persons who answered the question about race on the juror qualification questionnaire,[2] only 1.714 per cent indicated that they were black. Appellant's affidavit also contained data from the 1980 Census indicating that 3.73 per cent of the Eastern District's population aged eighteen or over was black. The government filed its own affidavits identifying several flaws in appellant's statistics. In addition, the government's affidavits presented alternative statistics in support of the proposition that between 1978 and 1980, 2.87 per cent of those summoned for grand jury service and 2.02 per cent of the grand jurors who actually served were black.

Even if we accept appellant's figures as correct, they show only a 2.02 per cent "absolute disparity" in black representation—that is, the difference between the percentage of eligible blacks in the population and the percentage of blacks on the master wheel is 2.02 per cent. A number of circuits have found an absolute disparity of this size or even larger insufficient to show underrepresentation. *See, e.g., United States v. Clifford,* 640 F.2d 150 (8th Cir. 1981) (absolute disparity of 7.2 per cent); *United States v. Armstrong,* 621 F.2d 951 (9th Cir.1980) (absolute disparity of 2.8 per cent); *United States v. Maskeny,* 609 F.2d 183 (5th Cir.1980) (absolute disparity of 10 per cent).

Appellant urges, however, that we adopt the "comparative disparity" method of calculating jury representation, which focuses on the percentage difference between the proportion of blacks eligible to serve as jurors (3.73 per cent) and the shortfall in black representation (2.02 per cent). Defendant argues that the comparative disparity of 54.2 percent in this case (calculated by dividing 2.02 per cent by 3.73 per cent) is sufficient to establish underrepresentation. In support of his argument, he cites dictum in *Foster v. Sparks,* 506 F.2d 805 (5th Cir.1975), to the effect that

> "an intractable use of the absolute measure may, in certain circumstances … produce distorted results. For example, if a district with 10% non-white population has .5% non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure but may require it under a comparative measure. Hence, flexible use of the two measures is advisable, with the selection of either to be guided by both a desire to avoid distorted results and a need to adequately protect the interests of those challenging the selection system." *Id.* at 835.

Appellant points out that the number of blacks in the Eastern Division is so small that the absolute disparity figure would be

---

**2.** Of the persons who answered the qualification questionnaire, 1226, or approximately 9.5%, did not indicate their race.

below 4 per cent even if every black in the region were excluded from jury service.

Although we acknowledge the possibility that the comparative disparity calculation might be a useful supplement to the absolute disparity calculation in some circumstances,[3] we do not believe that it necessarily produces a more accurate result where, as here, the group allegedly underrepresented forms a very small proportion of the total population. In fact, the smaller the group is, the more the comparative disparity figure distorts the proportional representation. For example, in an area that had 500,000 whites and only one black eligible to serve as jurors, a random selection system that failed to place the single black on the master wheel would produce a 100 per cent comparative disparity, even though an all-white jury would clearly form a "fair cross section" of the community. We agree with the conclusions of the court in *United States v. Whitley*, 491 F.2d 1248 (8th Cir. 1974), that the comparative disparity calculation "is ordinarily inappropriate where a very small proportion of the population is black" and that "in such a circumstances [it] distorts reality". *Id.* at 1249.

Even if we believed that the comparative disparity calculation was appropriate in the circumstances of the case before us, we would be reluctant to perform such a calculation in this case. A small variation in the figures used to calculate comparative disparity can produce a significant difference in the result, and the appellees have demonstrated that there is reason to doubt the accuracy of the figures on which appellant would have us rely. We therefore conclude that appellant has failed to carry his burden

of showing underrepresentation and do not reach the "systematic exclusion" prong of the *Duren* test.

We turn next to appellant's claim that the district court committed reversible error by failing to warn him of the hazards of proceeding pro se and by failing to make findings that his waiver of counsel was knowing and intelligent. In essence, appellant argues that the district court has failed to meet the standard for waiver of counsel established in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975):

> "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. at 2541 (citations omitted).

The Supreme Court has also held that the fact of waiver may not be presumed ·or inferred from a silent record, *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962), and that "it would be fitting and appropriate" for the record to reflect the trial court's finding of effective

---

**3.** Appellant points out that this court used the comparative disparity calculation in *LaRoche v. Perrin*, 718 F.2d 500 (1st Cir.1983). Although the court did use a comparative calculation in *LaRoche* when it found that the jury selection process "consistently underran by some 70%" the representative proportion for the 21 and 34 year age group, the absolute disparity was also sufficient to establish underrepresentation. The 21 to 34 year age group constituted 38.4% of the total population and only 12.2% (on average) of the venires, for an absolute disparity of 26.2%. It is also significant that the *LaRoche* opinion did not adopt the comparative

disparity analysis to deal with the very situation for which appellant would have us believe it is ideally suited—the situation in which the group allegedly underrepresented forms a very small proportion of the total population. The court observed:

> "Blacks constituted under 1% of Rockingham County's population during the relevant period. The total number of grand jurors serving during those years was 120, and hence at most one or two blacks should have served under a random selection system. A shortfall from 1% to 0% hardly constitutes material underrepresentation." *Id.* at 502.

waiver, *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

This court has not interpreted these decisions to mean that the district court must issue a particular warning or make specific findings of fact before it allows the defendant to proceed pro se. Instead, we have held:

> "[T]he defendant's knowledge of [the disadvantages of self-representation] need not appear on the record at trial. The district court may properly consider, in addition to [the defendant's] background, experience and conduct, such factors as his involvement in previous criminal trials, his representation by counsel before trial, and the continued presence of advisory counsel at trial . . . ." *Maynard v. Meachum,* 545 F.2d 273, 279 (1st Cir.1976) (citations omitted).

Although appellate review would be simplified if the district court provided a short statement of its reasons for finding a defendant's waiver of counsel to be knowing and intelligent, neither the Supreme Court nor the case law of this circuit has imposed such a requirement.

In this case, we find that there is ample evidence in the record to warrant a finding that appellant knowingly and intelligently waived his right to counsel. Appellant is a college graduate with two years of law school. *See United States v. Bailey,* 675 F.2d 1292 (D.C.Cir.1982) (holding that a finding of valid waiver was supported by the fact that defendant had studied law in prison). Appellant's financial dealings bespeak considerable sophistication. He had previously been convicted of fraud and had served a prison sentence for the crime. *See id.* at 1302 (holding that defendant's previous felony conviction was "a factor which necessarily indicates that [defendant] had some knowledge and understanding of the relevant law and courtroom procedure").

Although appellant's rambling presentation of his case was not a model of trial advocacy, he received aid at key points from his standby counsel, who presented appellant's insanity defense; cross-examined the government's psychiatrist; made numerous evidentiary and procedural objections; made a motion for a judgment of acquittal; argued the jury instructions; and presented a closing argument. Nor were appellant's efforts in his own behalf wholly incompetent: he made a number of pretrial motions, alluded at trial to a recent Supreme Court case, and requested that witnesses be summoned. *See Fillippini v. Ristaino,* 585 F.2d 1163, 1167 (1st Cir.1978) (noting that defendant "made it clear that he was aware of the existence of technical rules and that presenting his defense was more than just telling his story by, for instance, asking the judge to help him summon witnesses").

Appellant would make much of the fact that the trial judge was aware that he intended to present an insanity defense, and that this knowledge placed the judge under an obligation to make a more searching inquiry into the propriety of appellant's choice to represent himself. We are at a loss to understand why appellant's claim to have been insane at the time (more than a year before trial) when he engaged in the fraud—a claim subsequently rejected by the jury—should affect the question whether he knowingly and intelligently waived his right to counsel. It is appellant's mental state at the time of the trial, not his mental state at the time of the crime, that establishes his ability to make a valid waiver. Appellant does not dispute that he was competent to stand trial; from this fact the trial court was entitled to infer that he was also competent to waive his right to counsel. In addition, we note that appellant's counsel, who had represented him for several months preceding trial and who was consequently in a better position than the trial court to assess his mental state, made no objection to the validity of appellant's decision to proceed pro se.

Finally, appellant argues that even if the record supports a finding that he knowingly and intelligently waived his right to counsel, his waiver is not valid unless accompanied by a specific warning from the trial court of the dangers of self-representation. The trial court, on learning that appellant

had decided at the last minute to proceed pro se, remarked:

> "You have the Federal Defender made available to you. If you are foolish enough to want to go ahead on your own, that is your business .... Mr. Walker will be here and available, if you need him."

The appellant responded:

> "I understand fully what you are saying. I know about the old adage that, 'He who represents himself', you know ...."

The Supreme Court did not require in *Faretta* that the trial court issue a specific warning; instead, it held that the defendant who chooses to proceed pro se "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942)). The simplest method to insure that the record reflects defendant's awareness of the dangers of self-representation is for the trial court to issue a warning enumerating those dangers. Some courts have exercised their supervisory powers to require such a warning. For example, in *United States v. Welty*, 674 F.2d 185 (3d Cir.1982), the court held that "the district court should advise [the defendant] in unequivocal terms both of the technical problems he may encounter in acting as his own attorney and of the risks he takes if his defense efforts are unsuccessful". *Id.* at 188. In *United States v. Bailey*, 675 F.2d at 1300, the court enjoined the district court to adopt "the practice of making clear on the record the awareness by defendants of the dangers and disadvantages of self-representation as to which the Supreme Court in *Faretta* has voiced its concern".

█ Although the practice of issuing specific warnings to defendants who wish to proceed pro se is a good way—perhaps the best way—to insure that the requirements of *Faretta* are met, it is not the *only* way. In the case before us, the district court warned appellant that he was "foolish" to proceed without counsel, and he replied that he understood fully the court's admonition. The defendant's assertion that he understands the consequences of his waiver "does not automatically end the judge's responsibility", *Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948), but it is entitled to some weight. In this case, the defendant's claim to understand the dangers of self-representation was supported by the circumstances we have already identified, particularly by the facts that he had had two years of legal education and that he had previously served a prison sentence for fraud. We see no reason to find that his waiver of counsel was anything other than knowing and intelligent.

*The judgment of the district court is affirmed.*