June 8, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1193
UNITED STATES OF AMERICA,

Appellee,

v.

RENE M. PION,

Defendant, Appellant.

ERRATA SHEET

The opinion of this Court, issued June 1, 1994, is amended
as follows:

Page 11, line 22, should read: . . . Jury Wheel are the
best . . .

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1193

UNITED STATES OF AMERICA,

Appellee,

v.

RENE M. PION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Cyr, Circuit Judge.

Benjamin D. Entine for appellant.

Geoffrey E. Hobart, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, and George W. Vien,

Assistant United States Attorney, were on brief for appellee.

June 1, 1994

CYR, Circuit Judge. After a two-week trial, Rene Pion
CYR, Circuit Judge.

was convicted on three cocaine-related charges and sentenced to

concurrent mandatory minimum ten-year prison terms, pursuant to

21 U.S.C. 841(b)(1)(A)(ii).1 We address each of Pion's appel-

late claims.

A. Entrapment

Without challenging the jury instruction on entrapment,

Pion contends that the evidence compelled jury acceptance of his

entrapment defense. We therefore inquire whether a rational jury

could have found, beyond a reasonable doubt, either that he was

predisposed to commit the particular crime charged or that the

government did not induce him to commit it. Jacobson v. United

States, U.S. , , 112 S. Ct. 1535, 1540 (1992); United

States v. Reed, 977 F.2d 14, 18 (1st Cir. 1992). Viewed in the

light most favorable to the verdict, United States v. Martinez,

922 F.2d 914, 923 (1st Cir. 1991), there was ample evidence that

Pion was not induced to commit any crime.

The only inducement to which he points on appeal is

that the government informant, Esteban Mendoza, plied and enticed

him with a "vital" supply of El Presidente beer for resale at

Pion's restaurant. According to Pion, the government thus

subjected him to "rigid economic coercion" to traffick in co-

caine. Not only was this fanciful claim not preserved below, it

1Count I charged conspiracy to possess cocaine, with intent
to distribute, see 21 U.S.C. 846; substantive counts II and III

charged possession of cocaine for distribution, and distribution
of cocaine, respectively, see id. 841(a)(1) & (b)(1)(A)(ii).

2

is squarely contradicted by his testimony at trial. Additional-

ly, the El Presidente beer Mendoza supplied Pion totalled nine

cases; none of it delivered until more than two weeks after he

unhesitatingly indicated his willingness to supply Mendoza with

the first one-half kilogram of cocaine. Thereafter, Pion partic-

ipated in a three-kilogram transaction (and agreed to arrange

another three kilograms) with no inducement except the implicit

"promise" of cocaine profits. Thus, the record reveals ample

support for a jury finding that Pion was no "unwary innocent" but

an "'unwary criminal' who readily availed himself of the opportu-

nity to perpetrate the crime." Mathews v. United States, 485

U.S. 58, 63 (1988).

B. Coconspirator Statements

Pion claims that the district court committed rever-

sible error by admitting into evidence coconspirator statements

pertaining to two separate conspiracies: the first involving a

one-half kilogram transaction on June 4, 1991; the second a

three-kilogram transaction on July 3.2 According to Pion, the

only possible link between the two transactions was the red Honda

automobile driven on June 4 by coconspirator "Rafael," purported-

ly Pion's cocaine supplier, and by coconspirator Christobalina

Tejada on July 3. Since Pion does not suggest that the district

2Pion's entire effort to identify the challenged coconspir-
ator statements is as follows: "The admission of alleged co-
conspirators [sic] statements from the second conspiracy against
Pion, in order to purportedly prove his involvement in the
alleged first conspiracy, and vice-versa, was therefore error and
was irreparably prejudicial to Pion."

3

court departed from the procedure required under United States v.

Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), and United States

v. Ciampaglia, 628 F.2d 632, 638 (1st Cir.), cert. denied, 449

U.S. 956 (1980), we review the conspiracy finding for clear

error, United States v. McCarthy, 961 F.2d 972, 977 (1st Cir.

1992). We find none.

The government quite correctly suggests that the red

Honda, registered to Tejada, was the "most obvious piece of

circumstantial evidence" linking the two transactions to the same

conspiracy. Equally conspicuous, however, yet overlooked by

Pion, were the three participants common to both transactions,

notably himself, "Rafael" and Tejada, and their tacit agreement

to traffick in cocaine. Nothing more was required.

C. The Transcripts

Without identifying the translations at issue, Pion

challenges, as ambiguous and inaccurate, government transcripts

containing English translations of Spanish conversations recorded

by Mendoza, the government informant, during various meetings

with Pion and other conspirators. Since Pion did not argue

before the district court that the transcripts were ambiguous, we

review only for plain error. See United States v. Mejia-Lozano,

829 F.2d 268, 272 (1st Cir. 1987); Fed. R. Crim. P. 52(b).

Even though Pion's failure to identify the challenged

statements severely hinders review, especially since the tran-

scripts are not included in the appellate record, see Fed. R.

App. P. 10(b), 11(a), we can say with confidence that there was

4

no error, plain or otherwise. The thrust of this contention is

that the transcripts are susceptible to two radically different

interpretations: one innocent (the recorded conversations merely

concerned beer); the other criminal (cocaine trafficking). The

record precludes any suggestion of error based on this newly

minted theory, as the evidence (including Pion's testimony) and

the recorded conversations themselves established beyond doubt

that beer was simply the means Mendoza used to gain access to

Pion.

The district court correctly followed the transcript-

admission procedure set out in United States v. Rengifo, 789 F.2d

975 (1st Cir. 1986), by first attempting, without success, to

obtain a stipulated transcript. See id. at 983. After Pion

objected to alleged inaccuracies in the authenticated government

transcript, he consented to its admission subject to the right to

introduce his own transcript. The court thereupon admitted the

government transcript and gave a cautionary jury instruction.

Notwithstanding the fact that the court recognized his right to

do so, Pion did not offer his own transcript. Later, Pion

objected when the government attempted to read portions of its

transcript to the jury. The court treated the objection as a

motion to strike, and denied it.

There was no abuse of discretion. United States v.

Font-Ramirez, 944 F.2d 42, 48 (1st Cir. 1991), cert. denied, 112

S. Ct. 954 (1992) (no "abuse of discretion" where defendant

neither offered transcript nor indicated specific inaccuracies in

5

government transcript); accord United States v. Devous, 764 F.2d

1349, 1355 (10th Cir. 1985).

D. Juror Misconduct

The district court's decision to conduct an in camera

inquiry to resolve a report of improper juror contact was well

within its broad discretion. See United States v. Reis, 788 F.2d

54, 59 (1st Cir. 1986). The transcript of the in camera inter-

view plainly reveals that the matters discussed directly per-

tained to whether the juror had been approached and whether he

could be impartial.

E. Jury Composition

Pion claims a deprivation of his constitutional right,

under the Sixth Amendment to the United States Constitution, to

be tried by a petit jury drawn from a representative cross -

section of the community.3 See Taylor v. Louisiana, 419 U.S.

3We do not share the view embraced by our brother, relating
to 28 U.S.C. 1867. See infra at pp. 16-19. First, it is

unnecessary to address section 1867, because the merits dispute
properly raised, briefed and argued by the parties, and carefully
considered by the district court, presents an insurmountable
barrier for appellant. See, e.g., Norton v. Mathews, 427 U.S.

524, 532 (1976); In re Unanue Casal, 998 F.2d 28, 33 (1st Cir.

1993). Second, the jurisdictional question our brother poses is
anything but easy, having been squarely addressed in its present
aspect by but one court of appeals, see United States v. De Alba-

Conrado, 481 F.2d 1266 (5th Cir. 1973), which concluded

contrary to the position taken in the concurring opinion that
constitutional challenges to jury composition are not barred by

28 U.S.C. 1867(e). Id. at 1270, n.4. Although we take no

position on the jurisdictional question, the difficulty with the
position espoused by our brother is succinctly stated in the
legislative history of 28 U.S.C. 1867(e):
Subsection (e) makes clear that the proce-
dures prescribed in this section are the
exclusive means for challenging compliance

with the statute. The bill, as amended by

6

522, 527 (1975). The district court accepted, arguendo, Pion's

statistical data indicating that though the 1990 census reflects

that 4.2% of the residents within the Eastern Division of the

District of Massachusetts are Hispanic, only 0.99% of all persons

responding to the juror questionnaire during 1992, and 0.80% of

those appearing for juror orientation, were Hispanic. These data

form the evidentiary base for Pion's sweeping claim that "Hispan-

ic minority members are so grossly underrepresented among federal

juries as to constitute a 'systematic exclusion of the group in

the jury-selection process'" (quoting Duren v. Missouri, 439 U.S.

357, 364 (1979)). The district court rejected the Pion claim on

the fundamental ground that the Amended Jury Plan for the Dis-

trict of Massachusetts ["Jury Plan"] is as broadly inclusive as

any in the nation and has been expressly approved under the

Federal Courts Administration Act of 1992, codified at 28 U.S.C.

1863(b)(2) (1992).4 On appeal, Pion nonetheless insists that

the committee, however, makes clear that the

act will not preclude any person or the Unit-

ed States from asserting rights created by

other statutes or for [sic] enforcing consti-

tutional rights.

H.R. Rep. No. 1076, 90th Cong., 2d Sess. (1968), reprinted in

1968 U.S. Code Cong. & Admin. News 1792, 1806 (emphasis added).
See also De-Alba-Conrado, 481 F.2d at 1270 n.5.

Given the express language employed in subsection
1867(e), and its explicit legislative history, id., we believe it

prudent to bypass the question, see Norton, 427 U.S. at 532,

rather than attempt, sua sponte, to resolve it on the present

record.

4Rather than voter lists or motor vehicle registration
lists, the baseline data utilized under the Jury Plan are the
alphabetical lists of all persons age seventeen and above resid-
ing in every Massachusetts city and town, compiled annually
pursuant to Mass. Gen. L. ch. 234A, 10 (1992). See United

7

the Jury Plan results in such substantial Hispanic underrepresen-

tation as to render it constitutionally infirm under the "system-

atic exclusion" standard employed in Duren v. Missouri, 439 U.S.

357, 364 (1979). The burden is on the defendant to

establish a prima facie case of unconstitutional disproportional-

ity. United States v. Benmuhar, 658 F.2d 14, 19 (1st Cir. 1981).

We conclude that Pion has not demonstrated that any Hispanic

underrepresentation on his jury venire was due to their "system-

atic exclusion in the jury-selection process." Id. at 366

(emphasis added). Consequently, he has failed to establish a

prima facie violation of the "fair-cross-section requirement."

Id. at 364; United States v. Hafen, 726 F.2d 21, 23 (1st Cir.),

cert. denied, 466 U.S. 962 (1984).

The government agrees that Hispanics constitute a

distinctive ethnic group in the Eastern Division of the District

of Massachusetts, thus conceding the first prong of the three-

part Duren test. See Duren, 439 U.S. at 364. The government

counters, however, that Pion failed to make the two other Duren

showings: that Hispanic representation on jury venires "is not

fair and reasonable in relation to the number of such persons in

the community" and that any such underrepresentation is "due to

systematic exclusion of [Hispanics] in the jury-selection pro-

States District Court, District of Massachusetts, Amended Jury
Plan at 3 (Sept. 6, 1989). Names are drawn at random from these
resident lists for inclusion in the Master Jury Wheel from which
potential grand and petit jurors' names are then randomly drawn.

8

cess." Id. Although both showings are problematic, we need

address only the "systematic exclusion" claim.

Pion presented uncontroverted evidence indicating a

3.4% "absolute disparity" between the 4.2% Hispanic representa-

tion in the relevant general population and the 0.80% Hispanic

representation among persons appearing for juror orientation.

See Hafen, 726 F.2d at 24 ("absolute disparity" standard more

appropriate than "comparative disparity" standard where allegedly

underrepresented group constitutes very small proportion of the

total population) (citing United States v. Whitley, 491 F.2d

1248, 1249 (8th Cir.), cert. denied, 416 U.S. 990 (1974)).5 For

the reasons stated in Hafen, 726 F.2d at 24, the "comparative

disparity" standard should not be employed in circumstances where

"a small variation in the figures used to calculate comparative

5The "comparative disparity" standard would measure the

percentage spread between the total number of Hispanics in the
relevant general population who are eligible for jury service
["eligible Hispanics"], i.e., assumedly 4.2%, and the shortfall

between the eligible Hispanic jurors (4.2%) and the percentage
appearing for juror orientation (0.8%), i.e., 3.4%. The "compar-

ative disparity" would be calculated by dividing the shortfall in

Hispanic representation (3.4%) by the percentage of eligible
Hispanics (4.2%), yielding a huge 81% "comparative disparity."
See Hafen, 726 F.2d at 23.

The "absolute disparity" standard, on the other hand, would

measure the gross spread between the percentage of eligible
Hispanics (4.2%) in the relevant population and the percentage of
Hispanic representation on the Master Jury Wheel. Here, Pion
wrongly assumes a 3.4% "absolute disparity." The reality is that

the spread between the 4.2% of eligible Hispanics and the per-

centage of Hispanics on the Master Jury Wheel has not been

established, nor can it be discerned, since the percentage of
Hispanics on the Master Jury Wheel is not disclosed in the

appellate record. Thus, Pion impermissibly assumes that the
0.80% Hispanic representation among all persons who appear for
juror orientation is the appropriate downside percentage for
measuring the absolute disparity in Hispanic representation.

9

disparity can produce a significant difference in the result, and

. . . there is reason to doubt the accuracy of the figures on

which appellant would have us rely."6

Pion has not demonstrated that any alleged Hispanic

underrepresentation on Eastern Division jury venires in the

District of Massachusetts is due to "systematic exclusion in the

jury-selection process." Duren, 439 U.S. at 366. He identifies

neither a systemic defect nor an operational deficiency in the

Jury Plan which would account for the alleged underrepresenta-

tion, compare id. at 366-67, and he expressly disavows any

suggestion that the Jury Plan was either designed or intended to

exclude Hispanics.

The first infirmity in the unfair cross-section claim

is that the district court found, and Pion does not dispute, that

the broadest data available resident lists are used to make

up the Master Jury Wheel from which Eastern Division jury venires

are drawn. There is no allegation, much less a showing, statis-

tical or otherwise, that data more conducive to a fair cross

section are available, let alone more fairly representative of

eligible Hispanics in the relevant general population. Second,

since the names included in the Master Jury Wheel are randomly

drawn from the most inclusive data available, and random selec-

tion also determines to whom juror questionnaires are mailed,

there can be no reasonable inference that the jury-selection

6For a fuller exposition of the rationale for utilizing the
"absolute disparity" standard in a case of this sort, see Hafen,

726 F.2d at 23-24.

10

process itself systematically excludes Hispanics at any stage up

to and including the distribution of juror questionnaires.

At that stage in the process, however, the data relied

on by Pion indicate, see 1992 Jury Wheel Report, Eastern Divi-

sion, Boston, Mass., that only .99% of those who complete and

return the jury questionnaire, and .80% of those who appear for

juror orientation, are Hispanic. Nevertheless, even assuming

their accuracy, these data demonstrate no Hispanic under-

representation on the 1992 Master Jury Wheel. And since only

those persons whose names are randomly drawn for the Master Jury

Wheel can receive a juror questionnaire (and, later, a summons to

juror orientation), Pion's allegation of "systematic exclusion"

based on the .80% Hispanic representation at juror orientation

(or the .99% responding to the questionnaire) is pure specula-

tion. See United States v. Garcia, 991 F.2d 489, 492 (8th Cir.

1993) (numerical underrepresentation not a proxy for systematic

exclusion); cf. Barber v. Ponte, 772 F.2d 982, 997 (1st Cir.

1985) (en banc) ("courts have tended to allow a fair degree of

leeway in designating jurors so long as the state or community

does not actively prevent people from serving or actively dis-

criminate, and so long as the system is reasonably open to all")

(emphasis in original); cert. denied, 475 U.S. 1050 (1986);

Benmuhar, 658 F.2d at 19 (finding "systematic exclusion" of

Hispanics as a result of Commonwealth of Puerto Rico's exclusion

of non-Anglophones from jury service). With no datum as to

Hispanic representation on the Master Jury Wheel, and given the

11

fact that the baseline data for comprising the Master Jury Wheel

are the best available, there can be no reasonable inference that

the relatively small Hispanic underrepresentation at juror

orientation is attributable to anything other than the randomness

of the draw from either the resident lists or the Master Jury

Wheel. Consequently, Pion generated no trialworthy issue on the

essential element of "systematic exclusion," Duren, 439 U.S. at

366.7

F. Mandatory Minimum Sentence (21 U.S.C. 841(b)(1)(A)(ii))

Pion contends that the sentencing court improperly

included an unconsummated three-kilogram cocaine transaction in

calculating the amount for which he was responsible, thereby

triggering the minimum ten-year sentence mandated by 21 U.S.C.

841(b)(1)(A)(ii) (ten-year minimum for distribution of five or

more kilograms of cocaine).8 At sentencing, the government

argued that Pion was responsible, under U.S.S.G. 2D1.1 comment.

(n.12) (1992) [hereinafter: "note 12"], for the additional three

7Duren provides an instructive contrast. There a very large

(39%) absolute disparity existed between the percentage of women

in the relevant population and their representation on jury
venires, a disparity which the Court found reasonably attribut-
able to a prominent feature in Missouri's jury-selection process;
that is, the longstanding practice of granting women automatic

exemption from jury service upon request. Duren, 439 U.S. at

366-67. Pion points to nothing in the Jury Plan, or its imple-
mentation, which would account for the much smaller (3.4%)
absolute disparity alleged here.

8The presentence report recommended that Pion be held
responsible for 3.5024 kilograms, the combined total delivered on
June 4 (approximately one-half kilogram) and July 3 (three kilo-
grams).

12

kilograms he negotiated to supply Mendoza in July.9 The court

determined, pursuant to note 12, that Pion was not "reasonably

capable of producing" the three additional kilograms.10 Then

it supportably found that the object of the conspiracy was to

distribute in excess of six kilograms of cocaine, including the

additional three kilograms Pion agreed to supply Mendoza later in

July.11 Accordingly, the court concluded that Pion was subject

9Note 12 states in relevant part:

The weight under negotiation in an uncomplet-
ed distribution shall be used to calculate
the applicable amount. However, where the
court finds that the defendant did not intend
to produce and was not reasonably capable of

producing the negotiated amount, the court
shall exclude from the guideline calculation
the amount that it finds the defendant did
not intend to produce and was not reasonably

capable of producing.

(Emphasis added.)

10The district court ruled:

I am unable to find by a fair preponderance

of the evidence that Mr. Pion was reasonably

capable of producing the negotiated amount.

I've already found that he intended to pro-
duce it. But on this record, and by this
record I include the presentence report and
all the representations made to me, I can not
find that he was reasonably capable of pro-
ducing the negotiated amount.

(Emphasis added.)

11The court found

by a fair preponderance of the evidence [that
Pion] knowingly, intelligently and voluntari-
ly entered into a course of conduct the nego-
tiation for which was and which contemplated
the delivery of an additional three kilog-
rams, or 3,000 grams of cocaine within the

13

to the ten-year minimum sentence mandated by statute for conspir-

ing to possess and distribute five or more kilograms of cocaine.

See 21 U.S.C. 841(b)(1)(A)(ii), 846. Relying on the finding

that he was not capable of producing the three additional kilo-

grams negotiated on July 3, see supra note 10, Pion argues that

the ten-year minimum sentence mandated under 21 U.S.C.

841(b)(1)(A)(ii) does not apply. We disagree.

Pion's position is confounded by the fact that note 12

is phrased in the conjunctive. See supra note 9. It requires

the sentencing court to include the "weight under negotiation in

an uncompleted distribution" unless it finds that "the defendant

did not intend to produce and was not reasonably capable of

producing the negotiated amount." Id. (emphasis added). Further-

more, note 12 directs the sentencing court once again in the

conjunctive to "exclude from the guideline calculation the

negotiated amount that it finds the defendant did not intend to

produce and was not reasonably capable of producing." Id.

(emphasis added). Its conjunctive phrasing clearly is intended

to avoid inflated sentences based on drug-quantity discussions in

uncompleted transactions where the defendants were merely puf-

fing; that is, where the defendants did not intend, and were

unable, to produce the amount under discussion. Cf. United

States v. Moreno, 947 F.2d 7, 9 (1st Cir. 1991) (applying former

following week. . . .

14

U.S.S.G. 2D1.4 comment. (n.1)). In sum, Pion's claim fails

because neither conjunctive clause in note 12 can be ignored.12

Although the district court did not find Pion reason-

ably capable of producing the additional three kilograms, it

found that he was a member of a conspiracy whose object was to

distribute more than six kilograms and that he specifically

intended to further the conspiratorial objective. See United

States v. Pennell, 737 F.2d 521 (6th Cir. 1984) (no "impossibili-

ty" defense available under 841(a)(i) and 846); United States

v. Everett, 700 F.2d 900, 904 (3d Cir. 1982) (Congress intended

to eliminate "impossibility" defense under 846); see generally

Wayne R. LaFave & Austin Scott, Jr., 2 Substantive Criminal Law

6.5(b), at 90-93 (1986) (discussing limits of "impossibility"

defense in conspiracy cases).

The district court correctly concluded that Pion's

inability to produce the additional three kilograms was no

12Although the parties assume that the drug-quantity deter-
mination arrived at under note 12 does not govern for purposes of
triggering a minimum sentence mandated by statute ["MMS"], see,

e.g., 21 U.S.C. 841(b)(1)(A)(ii), note 12 is not limited in

this fashion. Nor is there a statutory directive that might be
thought to govern the threshold drug-quantity determination for
MMS purposes. Absent a statutory alternative, therefore, we
think application note 12 provides the threshold drug-quantity

calculus upon which depends the statutory minimum sentence fixed
under 21 U.S.C. 841(b)(1)(A)(ii). See United States v. Hughes,

970 F.2d 227, 236 n.9 (7th Cir. 1992) (discussing U.S.S.G.
2D1.4, a forerunner to U.S.S.G. 2D1.1 comment. (n.12) (1992)-
).

15

impediment to its imposition of the ten-year minimum sentence

mandated by statute.13

Affirmed.

- Concurring Opinion Follows -

13Since there has been no showing of error, Pion's cumula-
tive-error claim collapses.

16

TORRUELLA, Circuit Judge (Concurring). Although I

agree with my colleagues on all parts of this well-crafted

opinion, with the exception of Part E thereof -- and even as to

that, I conclude that appellant has failed to raise a cognizable

claim before this court -- I must express myself separately with

respect to the substance of the majority's reasoning in reaching

our common result.

First of all, the court has reached issues and made

pronouncements thereon, which are not properly before us. I am

referring to appellant's allegation that the jury pool from which

the petit jury was drawn does not represent a cross-section of

the community, thus violating the Sixth Amendment of the Consti-

tution. See, Duren v. Missouri, 439 U.S. 357 (1979).

This contention was raised by appellant, after convic-

tion, as part of a supplemental motion for a new trial. It

therefore clearly fails to comply with the provisions of the Jury

Selection and Service Act of 1968, 28 U.S.C. 1861-1876, pursu-

ant to which:

In criminal cases, [challenges to the
composition of the jury must be raised]
before the voir dire examination begins,
or within seven days after the defendant
discovered or could have discovered, by
the exercise of diligence, the grounds
[for such a challenge] . . .

28 U.S.C. 1867(a). This statute further establishes that:

The procedures prescribed by this section
shall be the exclusive means by which a

person accused of a federal crime, . . .
may challenge any jury on the ground that
such jury was not selected in conformity
with the provisions of this title.

-16-
16

28 U.S.C. 1877(e) (emphasis added).

The government's apparent lapse in not challenging

appellant's failure to comply with these mandatory requirements,

and the district court's complacency therewith, are irrelevant to

determining whether the issue is properly before us. The jury

challenge requirements are to be strictly construed and failure

to comply precisely with their terms forecloses any challenge to

the composition of the jury. United States v. Cooper, 733 F.2d

1360 (10th Cir. 1984), cert. denied, 467 U.S. 1255 (1984); United

States v. Green, 742 F.2d 609 (11th Cir. 1984); United States v.

Raineri, 670 F.2d 707 (7th Cir. 1982), cert. denied, 459 U.S.

1035 (1982); United States v. Bearden, 659 F.2d 590 (11th Cir.

1981), cert. denied, 456 U.S. 936 (1981); United States v. Young,

570 F.2d 152 (6th Cir. 1978); United States v. D'Alora, 585 F.2d

16 (1st Cir. 1978); Government of Virgin Islands v. Navarro, 513

F.2d 11 (3d Cir. 1975), cert. denied, 422 U.S. 1045 (1975);

United States v. Fern ndez, 497 F.2d 730 (9th Cir. 1974), cert.

denied, 420 U.S. 990 (1974). Any objection to jury composition

which is not timely raised is considered waived for all purposes.

United States v. Webster, 639 F.2d 174 (4th Cir. 1981), cert.

denied, 454 U.S. 857 (1981); United States v. Young, supra;

United States v. Grismore, 546 F.2d 844 (10th Cir. 1976).

The record shows that appellant failed to raise the

jury composition issue in a timely fashion,1 and thus, as a

1There is no allegation that appellant was impeded from
doing so for any valid reason, or that the information upon which
his claim is based was unavailable.

-17-
17

matter of law, he is foreclosed from the right to contend this

matter on appeal. We therefore need go no further. Yet we do,

and I am thus required to express my disagreement with the

majority's unnecessary dicta regarding the merits of this issue.

As is well known, to establish a prima facie violation

of the cross-section requirement, a petitioner must show: (1)

that the group alleged to be excluded is a "cognizable" or

"distinctive" group in the community; (2) that the representation

of this group in venires from which juries are selected is not

fair and reasonable in relation to the number of such persons in

the community; and (3) that the underrepresentation in peti-

tioner's venire is due to the systematic exclusion of the group

in the jury-selection process. Duren v. Missouri, 439 U.S. 357,

364 (1979); Hern ndez v. Texas, 347 U.S. 475, 579 (1954).

There should be little doubt regarding the cog-

nizability of Hispanics for Sixth Amendment purposes. See

Hern ndez v. Texas, 347 U.S. at 475; Thiel v. Southern Pacific

Co., 328 U.S. 217, 220 (1986). Where I part company with my

colleagues is in our relative application of the second and third

Duren prongs.

In my view, in contrast with the majority, the figures

presented by appellant show a statistically significant under-

representation of Hispanics within the jury venire. According to

the 1990 census, 4.2% of the residents within the Eastern Divi-

sion of the District of Massachusetts, the relevant community,

are Hispanics. Yet Hispanics represent only .80% of the venires

-18-
18

for that Division. Otherwise stated, although the population

composition is such that one would expect 42 Hispanics to serve

on the district court's jury for every one-thousand citizens

called to such duty, in fact only eight Hispanics serve in the

venires for every one-thousand citizens called. Appellant

further contends that when compared with other identifiable

ethnic groups, such as non-minority whites, blacks or American

Indians, only Hispanics are disproportionately underrepresented -

- and the statistics were produced to support this contention.

According to my calculations, if one takes the above

figures as correct, Hispanics are underrepresented in the venire

by 80.95% as compared to their numbers in the community.2 Duren

v. Missouri, supra, at 364. Such a disparity is not only statis-

tically significant but also constitutionally cognizable. Id.

My method of determining disparity is dubbed the "comparative

disparity" standard by my colleagues, ante at 8 n.5, which they

understand should not be used "where [the] allegedly under-

represented group constitutes [a] very small proportion of the

total population." Id. Citing United States v. Hafen, 726 F.2d

21, 23-24 (1st Cir. 1984), they promote the so-called "absolute

disparity" standard, ante at 9 nn.5-6, whereby they conclude that

2This percentage of underrepresentation is measured by
calculating the shortfall between the percentage of eligible

Hispanic jurors (4.2%) and the percentage appearing for juror
orientation (0.8%), i.e., 3.4%, and then dividing the shortfall

in Hispanic representation (3.4%) by the percentage of eligible
Hispanics (4.2%).

-19-
19

the underrepresentation is only 3.4%,3 a spread which is said to

be constitutionally insignificant. Hafen tells us that this

system of calculating disparity should be used where the cogniza-

ble group is small because if the "comparative disparity" method

is used under those circumstances, it will distort "reality."

Hafen, 726 F.2d at 24.

I believe this to be an erroneous conclusion for

several reasons. First of all, I find Hafen to run contrary to

prior, valid circuit precedent in La Roche v. Perrin, 718 F.2d

500 (1st Cir. 1983), which established the so-called comparative

disparity calculation as the circuit standard for determining

underrepresentation. See also Barber v. Ponte, 772 F.2d 982, 989

n.n.11, 12 (1st Cir. 1985). Hafen's attempt to distinguish La

Roche is unconvincing. Secondly, the majority's approach leaves

us without any guide or standard as to when the cognizable group

is to be considered too small or large so as to trigger the

switch from one standard to the other. It would appear that

applying different constitutional standards to varied groups,

depending on whether they are large or small, would not only

raise substantial equal protection issues, but would defeat the

important goals promoted by the Jury Selection and Service Act

and the Sixth Amendment. The minorities most in need of protec-

tion are those least entitled to it, to allegedly prevent a

"distortion of reality." I might ask who's "reality" are we

talking about? To my view, the true distortion of "reality" is

34.2% - .8% = 3.4%.

-20-
20

the failure of a criminal law system, before which is tried a

large number of persons from an ethnic group, to include within

its mechanisms the peers of those charged, at least in some

reasonable measured proportion to their membership in the popula-

tion. Finally, on its face the so-called "absolute disparity"

standard appears to run contrary to Duren, which speaks to "the

representation of [the] group in the community . . . in relation

[i.e., in comparison] to the number of such persons in the

community." Duren, supra, at 364. This language seems to speak

in comparative, not in absolute, terms.

We thus come to the issue of systematic exclusion.

Normally, systematic exclusion requires a showing of substantial

disparity in numbers over a sustained period of time, Barker v.

Ponte, 772 F.2d 982, 989 (1st Cir. 1985), something which has not

been established by appellant in this case. I believe, however,

that where the disparity established by the claimant reaches the

proportion of those in the present case, 80.95%, the burden must

be shifted to require the government to justify that such an

aberration is not the product of inappropriate conduct. In most

cases, such as perhaps the present one, this should be a burden

easily explainable by the government.

Had appellant complied with the absolute requirements

of 28 U.S.C. 1867, I would have voted for reversal of his

conviction. Having failed to do so, however, I concur in the

affirmance of his conviction, although as indicated above, I

believe that at least part of the majority's reasoning is flawed.

-21-
21